**William R. ROSE, Plaintiff–Appellee,**

v.

**Greg FRANCHETTI, doing business as Fall River Airways, Defendant–Appellant.**

Nos. 89–2765, 90–1371.

United States Court of Appeals, Seventh Circuit.

Reargued Sept. 25, 1992 *.

Decided Oct. 21, 1992.

---

\* The case was originally argued on April 3, 1992. Senior District Judge Noland, sitting by designation, died before the case was decided. Judge Posner was drawn to replace him, and the case was reargued.

Warren R. Fuller (argued), Karen Arndt Berres, South Barrington, Ill., for plaintiff-appellee in No. 90–1371.

Warren R. Fuller, Karen Arndt Berres (argued), South Barrington, Ill., for plaintiff-appellee in No. 89–2765.

Judith E. Fors, Chicago, Ill. (argued), for defendant-appellant.

Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Military pilots do not start at the Top Gun school. Their education begins with trainers, simple aircraft that are easy to fly and have two sets of controls, so that instructors can take over if necessary. Airframe manufacturers also cut their teeth on easy projects. The Canadian affiliate of de Havilland Aviation, an old British firm, entered business with a trainer. De Havil-

land U.K. long had supplied the R.A.F. with the Mosquito and Tiger Moth trainers. In 1947 de Havilland Canada delivered a successor, the Chipmunk. Using the same Gypsy Major 4–cylinder engine that powered the Tiger Moth, the Chipmunk had a cruising speed of 119 miles per hour and a maximum speed of 138 m.p.h. See *The Observer's Basic Military Aircraft Directory* 170 (William Green & Gordon Swanborough eds.); *Jane's All the World's Aircraft 1949–50* 50c (Leonard Bridgman ed. 1949). De Havilland eventually made more than 1000 Chipmunks. Sixty of these were the model DHC–1B–2, only a few of which still are outfitted as military planes (the rest having been retired or converted to civilian instruments).

Greg Franchetti, an aircraft broker, owned one of the military DHC–1B–2 versions, made in 1956, and advertised that he wished to sell it. William Rose, a collector, saw the ad and told two of his agents, William Meier and Andrew Spak, to investigate and, if appropriate, negotiate for its acquisition. Spak called Franchetti, a citizen of Rhode Island doing business in Massachusetts. According to Spak's affidavit, during a series of telephonic conversations Franchetti assured him that the plane was in good condition, having been maintained to the Federal Aviation Administration's specifications. Spak liked what he heard. Meier and Spak traveled from Illinois to Massachusetts, inspected and bought the Chipmunk for $29,000, and flew it back to Illinois.

En route the engine lost a lot of oil. Meier, the pilot, had to land to replace it. At home base in Illinois, on inspecting the engine more carefully than he had in Massachusetts, Spak, a federally certified mechanic, discovered the cause: a large crack in the engine block. The crack had been covered with epoxy, painted black to hide this irregular, and ineffectual, "repair." Spak found the patch only after disassembling the engine. Parts for Gypsy Major engines are not readily available, and whole engine blocks are hard to come by. So the plane sits in the hangar, its engine still in pieces. At least this is the story as Rose tells it. Franchetti denied responsibility, leading to this diversity suit for breach of contract and fraud.

Franchetti contested personal jurisdiction, Fed.R.Civ.P. 12(b)(2), contending that he neither conducted business in Illinois nor committed a tort there. Unless he did one or the other, the Illinois long-arm statute in force at the time did not permit service of process. Franchetti asked the judge to transfer the case to Massachusetts in the event he found jurisdiction. See 28 U.S.C. § 1404(a). The judge concluded that Franchetti had committed a tort in Illinois by initiating phone conversations with Spak, making misrepresentations that led Rose to spend money to send Meier to Massachusetts. 713 F.Supp. 1203 (N.D.Ill.1989). The court declined to transfer the case, observing that Rose would be as inconvenienced by litigation in Massachusetts as Franchetti is by litigation in Illinois. *Id.* at 1213–15.

Having concluded that Franchetti must defend, the judge set a timetable for discovery. The cutoff date passed without any response from Franchetti—no answers, not even objections or motions for more time. Franchetti's lawyer asked for permission to withdraw, telling the judge that his client would not cooperate. Counsel stated in open court that he sent Rose's discovery requests to Franchetti and discussed them with him by phone, but that Franchetti refused to respond. The judge granted the motion to withdraw and added: "I am defaulting [Franchetti] for failure to cooperate with the Court.... If he wants to come in and conform, he may, I won't default him. If he comes in and shows me any reason at all, I will vacate it." The clerk sent Franchetti, now without a lawyer, a notice of this order. He did not respond. At the hearing to prove damages, Franchetti's first lawyer sent an associate as an accommodation to his former client, who had yet to retain a replacement. This lawyer knew nothing about the case and had no defense to offer. The court received one-sided evidence and fixed damages at $29,000, the price of the airplane, plus attorneys' fees, finding that the air-

frame was worthless without a functional engine.

Two months later Franchetti's new lawyer filed a motion under Fed.R.Civ.P. 60(b) to set aside the default and judgment. Franchetti signed an affidavit asserting that he had not known about the discovery requests and would have replied, had only his first attorney told him about the need to do so. At an evidentiary hearing Franchetti testified to the same effect. He added that he had not made any misrepresentations about the condition of the engine. Walter Schulz, a mechanic and friend of Franchetti, described the repairs he had made to the engine, including a patch to the lower engine case. Schulz related that he had flown the Chipmunk without losing significant amounts of oil.

Rose called Arnold Landis, Franchetti's first attorney, who testified that he sent the discovery requests to Franchetti and discussed the subject with him by phone on five occasions. Contemporaneous time records showed these calls (although not their content). Landis produced a receipt for a copy of his motion to withdraw, which he sent to Franchetti by certified mail. The receipt was signed by Ken Almeida; Franchetti concedes knowing Almeida and letting him fly the Chipmunk and other planes but denies that Almeida is his agent or employee. At the conclusion of the hearing the judge stated:

I will make a finding of fact that he [Franchetti] did receive the interrogatories, that he did receive the notice of withdrawal, that he did receive every phone call that Mr. Landis said that he gave him and that he is not here in good faith.

I think he is a liar, I think he is a phony, and I think to use up this Court's time and make me sit here until 5:30 at night and stay here all day long on a case that he shouldn't have had in the first place—now, I'm not called upon to make a decision on this airplane business because he has been defaulted, but I think he is a fraud and I think the airplane deal was a fraud, and I would throw him in jail if I had a chance to tonight, but I'm not

going to because he is going to catch an airplane and go back to Massachusetts and stay out of here.

However, he is going to pay the attorney's fees for Mr. Fuller [Rose's lawyer] for being here and he is going to pay the reasonable hourly rate for Mr. Landis for being here today and having to testify. He is also going to pay a Rule 11 sanction of two thousand dollars for what it costs to run this courtroom today with all of the staff and all of the heat and the judge's time and everybody else's.

Needless to say, the court denied the motion to vacate the judgment.

■ At the time this case began, the long-arm statute, Ill.Rev.Stat. ch. 110 ¶ 2–209, asserted jurisdiction when the claim arises out of "(1) The transaction of any business within this State; [or] (2) The commission of a tortious act within this State". Both the district court and the parties concentrated on ¶ 2–209(a)(2), believing that ads and phone calls do not satisfy the "transaction of ... business" section. *Cook Associates, Inc. v. Lexington United Corp.*, 87 Ill.2d 190, 57 Ill.Dec. 730, 429 N.E.2d 847 (1981).

Pinning down the location of a tortious act in a multi-state transaction is no picnic. If Franchetti, standing in Massachusetts, told a lie while talking on the phone with Spak, is this a tort "in" Illinois? It takes an injury to turn a wrong into a tort, and the injury was the purchase of a defective plane, which occurred in Massachusetts. That was Franchetti's final act, and Illinois equates "the tort" with the last wrongful act. *Green v. Advance Ross Electronics Corp.*, 86 Ill.2d 431, 437, 56 Ill.Dec. 657, 661, 427 N.E.2d 1203, 1207 (1981). Yet the injury was felt when the oil leaked (over New York or Ohio?) and when the plane was grounded in Illinois.

After Rose filed this suit, but before the district court entered judgment, Illinois added some bases of personal jurisdiction to its long-arm statute. A new ¶ 2–209(a)(7) provides that "[t]he making or performance of any contract or promise substantially connected with this state" creates personal jurisdiction. By specify-

ing that jurisdiction depends on a substantial connection between the transaction and the state, this language eliminates the fruitless search for the one "right" place to litigate a multi-state transaction. See *Continental Bank, N.A. v. Everett*, 964 F.2d 701, 703 (7th Cir.1992). Paragraph 2–209(a)(7) fits our case nicely. Franchetti's ad reached Illinois and attracted a buyer; Franchetti knew that he was dealing with a customer in Illinois, to which the plane would head and in which any injury would register; the warranty accompanying the sale would lead to performance in or affecting Illinois. Such dealings suffice under ¶ 2–209(a)(7), and the due process clause of the Constitution as well. See *Quill Corp. v. North Dakota*, —— U.S. ——, ——, 112 S.Ct. 1904, 1910–11, 119 L.Ed.2d 91 (1992); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–78, 105 S.Ct. 2174, 2181–85, 85 L.Ed.2d 528 (1985).

■ All Franchetti can say in reply is that the amendments should not be used when process was served before their enactment. Retroactive legislation is possible but hardly favored, *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 841–57, 110 S.Ct. 1570, 1579, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring); *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225, 227–28 (7th Cir.1992), and the state legislature did not direct courts to apply these changes to pending cases. Illinois does, however, apply changes in rules of judicial procedure retroactively, *Rivard v. Chicago Fire Fighters Union*, 122 Ill.2d 303, 310, 119 Ill.Dec. 336, 340, 522 N.E.2d 1195, 1199 (1988), just as most changes in the federal rules of procedure apply to ongoing cases. See Fed.R.Civ.P. 86. Compare *Bradley v. Richmond School Board*, 416 U.S. 696, 711–16, 94 S.Ct. 2006, 2016–18, 40 L.Ed.2d 476 (1974), with *United States v. Kimberlin*, 776 F.2d 1344 (7th Cir.1985).

Rules for personal jurisdiction do not regulate primary conduct. Massachusetts substantive law governs this dispute no matter where the litigation occurs, and Franchetti does not contend that in selling to a buyer from Illinois he relied on a belief that Illinois courts would lack personal jurisdiction. Statutes such as ¶ 2–209(a) also do not affect the timing or manner of service. Everything, from the sale of the plane to the service of process, would have proceeded exactly as it did had ¶ 2–209(a)(7) been in force a year or a decade earlier. Standard objections to retroactive laws that change the rules or penalties after the fact accordingly do not come into play.

All constitutional questions to one side, our task is to predict whether the Supreme Court of Illinois will use the amendments to ¶ 2–209 to support jurisdiction when the plaintiff served the defendant with process before the change in the law. *Salve Regina College v. Russell*, —— U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991); *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Decisions of intermediate state courts offer the best guidance in this enterprise, and we follow their lead unless we have solid reason to believe that the state's highest court would repudiate them. E.g., *Tippecanoe Beverages v. S.A. El Aguila Brewing Co.*, 833 F.2d 633, 638–39 (7th Cir.1987); *Williams, McCarthy, Kinley, Rudy & Picha v. Northwestern National Insurance Group*, 750 F.2d 619, 624 (7th Cir.1984). One appellate court has applied the changes in ¶ 2–209 retroactively. *Ores v. Kennedy*, 218 Ill.App.3d 866, 161 Ill.Dec. 493, 497–98, 578 N.E.2d 1139, 1143–44 (1st Dist.1991). No state court has disagreed. *Ores* relied on a decision by the Supreme Court of Illinois applying other amendments to the long-arm statute retroactively. *Nelson v. Miller*, 11 Ill.2d 378, 382–83, 143 N.E.2d 673, 676 (1957). That court has not questioned *Nelson* in the intervening years, and we therefore have no reason to believe that it will disapprove *Ores*. Retroactive application of ¶ 2–209(a)(7), like other legislation adjusting the benefits and burdens of economic life, comports with the due process clause. *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1983); *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 14–20, 96 S.Ct. 2882, 2892–95, 49 L.Ed.2d 752 (1976). So the amended provision applies to this case and vindicates the district judge's conclusion that the long

arm of Illinois reaches Franchetti in Massachusetts.

■ With the plane grounded in Illinois, available for inspection only in its disassembled state, the Northern District of Illinois is as suitable a location for the trial as is the District of Massachusetts. The district judge did not abuse his discretion in denying the motion for transfer under § 1404(a).

■ After the district court denied the motion to dismiss or transfer the case, Franchetti declined to participate in discovery. Failure to answer interrogatories on time should lead to a motion to compel, with decision "upon reasonable notice". Fed.R.Civ.P. 37(a). If the party defies a judicial order compelling a response, sanctions follow; default is one authorized sanction. Fed.R.Civ.P. 37(b)(2)(C). Instead of following the sequence established by Rule 37—failure to make discovery, next an order compelling discovery, finally sanctions if the failure persists—the district court peremptorily entered an order of default. It may be that there is a difference between failure to make discovery and total disdain of the litigation, which the judge found had occurred. The rules do not state the limits of judicial power. *Chambers v. NASCO, Inc.,* — U.S. —, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Judges retain authority, long predating the Rules of Civil Procedure, to require parties to participate in rather than ignore pending litigation. Cf. *Newman v. Metropolitan Pier & Exposition Authority,* 962 F.2d 589 (7th Cir. 1992). But we need not explore this possibility.

What the district judge said on entering the default dispels any belief that he was imposing a sanction under Rule 37(b) without first issuing an order compelling discovery under Rule 37(a). He was trying to disabuse Franchetti of the foolish belief that if he ignored the court, the court would ignore him. The judge stated: "If he wants to come in and conform, he may, I won't default him. If he comes in and shows me any reason at all, I will vacate it." That court's order thus was the functional equivalent of a rule to show cause why default should not be entered, ripening into a formal default if unanswered. In the event, Franchetti showed no cause—not at the time, and not when he eventually filed a motion under Rule 60(b). Notice and an order under Rule 37 would have produced the same effect. Having found after a full hearing that Franchetti is a liar, the district court necessarily found a lack of good cause—and in this did not commit clear error or abuse its discretion. So although district judges should not say "default" when they mean "order to show cause," and should hold hearings before rather than after entering defaults, the difference did not affect Franchetti and accordingly does not supply a reason for reversal. 28 U.S.C. § 2111; Fed.R.Civ.P. 61.

■ What remains is the sanction imposed at the conclusion of the hearing. The district court found that Franchetti lied on the stand, and accordingly had filed a materially false motion. The judge ordered Franchetti to pay the expense of the hearing, including the fees of Rose's lawyer, the cost of Landis's time, and the expense of running the courtroom for one day. Whether the district judge used his common law power to penalize frivolous motions, see *Chambers,* or Fed.R.Civ.P. 11, does not matter. Appellate review is deferential. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 399–405, 110 S.Ct. 2447, 2457–61, 110 L.Ed.2d 359 (1990). As arbiter of fact, the judge was entitled to find that Franchetti was mendacious. This means that his motion was factually unsupported, and the entire procedure a waste of time, pursued, as the judge found, to vex his adversary. An award then is appropriate under both objective and subjective components of Rule 11. Our case is even easier than *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991), where a represented party furnished incomplete and misleading information to his lawyers and signed the resulting paper. "Where a represented party appends its signature to a document that a reasonable inquiry into the facts would have revealed to be without merit, we see no reason why a District Court should be powerless to sanction the party". *Id.* 498 U.S. at —, 111 S.Ct. at 932. Franchetti affixed his signature to an affidavit that,

the district judge found, he knew to be deceitful. Nothing more is necessary.

Penalizing a liar who happens to be a party is some distance from sanctioning a party whose evidence, presented in good faith, does not persuade the trier of fact. "Rule 11 does not allow an award of sanctions just because things went poorly after an investigation that was adequate in light of what was known (and how much time was available) before the paper was filed." *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 932 (7th Cir.1989) (in banc). Rule 11 does not disturb the American Rule under which each side bears its own expense of litigation. *Machinists District No. 8 v. Clearing*, 807 F.2d 618, 622 (7th Cir.1986). Its focus is "inputs rather than outputs, conduct rather than result." *Mars Steel*, 880 F.2d at 932. Still, bald lies in motions papers do not acquire immunity when the judge must assess the credibility of a witness to determine whether a statement be truth or fiction. Paying a few thousand dollars as a sanction for lying in a motion and on the stand is nothing compared with the five years' imprisonment to which such conduct exposes the perjurer. Cf. *United States v. Grayson*, 438 U.S. 41, 54–55, 98 S.Ct. 2610, 2618, 57 L.Ed.2d 582 (1978).

AFFIRMED.

Before BAUER, Chief Judge, and CUMMINGS and KANNE, Circuit Judges.