**ILLINOIS TOOL WORKS, INC., Plaintiff,**

v.

**METRO MARK PRODUCTS, LTD., et al., Defendants.**

No. 98 C 4244.

United States District Court, N.D. Illinois, Eastern Division.

April 22, 1999.

---

Thomas G. Scavone, Robert Anthony Vitale, Jr., Arthur Anthony Gasey, Sally Wiggins, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL, for Illinois Tool Works, Inc., plaintiff.

Bruce G. Thill, Patrick John Gorman, Thill, Favaro, Buzek & Gorman, Ltd., Palatine, IL, Elizabeth Hubbard, John C. O'Connor, Danielle Lisa Weiss, Hubbard & O'Connor, Ltd., Chicago, IL, Patrick J. Sherlock, Attorney at Law, Chicago, IL, for Metro–Mark Products, Ltd., defendant.

Elizabeth Hubbard, John C. O'Connor, Danielle Lisa Weiss, Hubbard & O'Connor, Ltd., Chicago, IL, for Metro–Mark Products, Roger E. Murbach, defendants.

Bruce G. Thill, Patrick John Gorman, Thill, Favaro, Buzek & Gorman, Ltd., Palatine, IL, Patrick J. Sherlock, Attorney at Law, Chicago, IL, for Horizon Marking Systems, Inc., Thomas C. Heinzel, Mark R. Pavliny, defendants.

## MEMORANDUM OPINION AND ORDER

SCHENKIER, United States Magistrate Judge.

The Rules of Civil Procedure—including those governing discovery—seek to promote "the just, speedy, and inexpensive determination of every action." Fed. R.Civ.P. 1. However, it is painfully obvious to litigants and courts that disputes over discovery can render this goal illusory. Whether through over-reaching by the party seeking discovery or recalcitrance by the party responding to discovery requests (or sometimes both), needless discovery disputes all too often disrupt the progress of a lawsuit, inflict additional expense on the parties, and require judicial attention that would be far better spent on addressing the merits of parties' disputes.

This case presents an example of just such a needless and unproductive discovery dispute. This dispute, which has led to substantial motion practice and discovery totally unrelated to the merits of the case, is the direct result of the defendants choosing to respond to legitimate discovery requests with deception rather than directness.

Illinois Tool Works, Inc. has filed a motion seeking sanctions and for a rule to show cause why defendants should not be held in contempt (doc. # 36) for violation of an Order of October 23, 1998 requiring that all the defendants "preserve the integrity of all computers that are issue here without any spoilation of any information contained therein" (10/23/98 Tr. at 4, cited in Pl.Mem., Ex. C).[1] In particular, plaintiff asserts this order was violated in connection with a Packard Bell computer in the possession of defendants, which failed to operate when produced for inspection just six days after the preservation order despite functioning properly a few days

1. In this opinion, plaintiffs' memorandum in support of its motion will be cited as "Pl. Mem."; defendants' response will be cited by "Def.Mem."; plaintiff's reply will be cited as "Pl.Reply Mem."; and defendants' reply in support of its cross-motion for sanctions will be cited as "Def.Reply Mem."

earlier. Plaintiff originally sought the ultimate sanction of a default judgment against defendants (Pl.Mem.1–2), but then withdrew that request in light of the subsequent disclosure that apparently no responsive documents existing on the computer had been destroyed (Pl.Reply Mem. 1). Plaintiff still seeks a panoply of other sanctions: (1) attorneys' fees and costs incurred as a result of having to subpoena documents from third-parties that should have been produced by defendants; (2) the fees and costs of plaintiff's computer expert; (3) plaintiff's attorneys' fees and costs associated with the document depositions; and (4) plaintiff's attorneys' fees and costs associated with its motion for sanctions. For their part, defendants deny that plaintiff is entitled to any relief, since no documents on the computer were actually destroyed. In addition, defendants have countermoved for sanctions against plaintiff (doc. # 45), arguing that plaintiff's motion was knowingly baseless.

By an Order dated February 24, 1999, this matter was referred to this Court for ruling on plaintiff's motion (and now defendants' counter-motion). In connection with these motions, the parties have conducted investigation and discovery, much of which is attached as exhibits to their legal memoranda. Plaintiff has twice deposed Thomas C. Heinzel, defendants' custodian of records; each side has retained computer experts, who have submitted reports or declarations and have also been deposed at length; and defendants also have offered affidavits of Mr. Heinzel and Mark Pavliny. At a status hearing on April 14, 1999, the parties agreed that the ample paper record submitted provides a sufficient basis for this Court to decide the motions, without the need for in-court testimony.

The Court has now fully reviewed all the materials submitted by the parties in connection with the pending motions. After careful consideration, the Court grants plaintiff's motion for sanctions, and denies defendants' counter-motion for sanctions.

## I.

The Court begins its discussion by setting forth its findings concerning the facts relevant to the pending motions.

### A. The Discovery Requests in Issue.

Plaintiff is in the business of selling hot stamp and thermal imprinting machines, as well as parts and consumable supplies used with those machines. Two of the individual defendants, Thomas C. Heinzel and Mark Pavliny, formerly were employed by the plaintiff, and thereafter were employed by or otherwise associated with the corporate defendants (Compl.¶¶ 8–9). Plaintiff alleges that the corporate defendants, Metro Mark Products, Ltd., Metro Mark Products, and Horizon Marking Systems, Inc., sell these same products in direct competition with plaintiff (Id., at ¶ 56). Plaintiff alleges, among other things, that the individual and corporate defendants misappropriated plaintiff's trade secrets, including plaintiff's customer list (Id., at ¶ 55). Plaintiff alleges that the defendants have violated the Lanham Act, 15 U.S.C. § 1125(a), as well as Illinois statutory and common law.

On September 4, 1998, plaintiff served a request for production of documents (Pl. Mem., Ex. A). The document request did not specifically request "invoices," but more broadly sought production of categories of documents that would plainly include invoices. E.g., Request No. 6 ("each document which refers, relates to or comments upon … the manufacture, assembly, sale or service of any product or part by any of the defendants"); Request No. 7 ("all documents that refer, relate to, comment upon or constitute any communication … between any of the defendants and any third parties, regarding hot stamp or thermal transferring printing equipment and/or parts and/or consumables thereof"); Request No. 10 ("all documents that refer, relate to, comment upon or identify customers of any defendant which were provided with or are using hot stamp

or thermal transfer and printing equipment and/or parts and/or consumables thereof"); Request No. 13 ("all customer lists for any product or service sold and/or offered for sale by any defendant"). Moreover, the request was not limited to documents in paper form, but was expressly "intended to seek documents and things as broadly as those words are defined by Fed.R.Civ.P. 34 and applicable case law" (Pl.Mem., Ex. A, at 2).[2]

Defendant did not object to those document requests (Pl.Mem., Ex. B, Response to Document Request). However, notwithstanding the scope of these requests, plaintiff produced only a single invoice (*Id.*).

### B. The Court's October 23, 1998 Order.

Understandably skeptical about this minimal production, plaintiff filed a motion to compel, which was heard by the Court on October 23, 1998. At that time, counsel for defendants—who has since been replaced by defendants' current counsel—represented to the Court that defendants had "complied fully" with plaintiff's document request (Pl.Mem.Ex. C, 10/23/98 Tr. at 2). Plaintiff indicated that on the morning of October 23, in addition to the one invoice referenced in the written response to the document request, defendants had produced "several additional invoices" (*Id.* at 3). However, plaintiff continued to express the concern "that there are additional documents that are out there that we will not receive unless we push and request them specifically" (*Id.*).

In response, the Court directed that defendant's primary custodian of documents, Mr. Heinzel, be made available for a deposition with regard to documents by no later than October 29, 1998, and that the deposition be conducted at Mr. Heinzel's expense (*Id.* at 3–4). In addition, the Court ordered "all parties to *preserve the integrity of all computers that are at issue here* without any spoliation of any information contained therein" (*Id.* at 4) (emphasis added). In response to what the Court plainly perceived as an effort by predecessor defense counsel to hedge in that broad directive, the Court was explicit about what its order meant:

> [I]f it's "don't push the delete button" or if it's "don't change the C drive" or *"don't pull the plug at the wrong time"* or "don't take a sledge hammer to it," *I don't want it spoiled in any way, okay, so don't limit it.*

(*Id.* at 5) (emphasis added). Later that same day, plaintiff served on defendants a request to inspect "any and all computers used by any of the defendants since November of 1996" (Pl.Mem.Ex. D). The inspection was arranged to take place at the offices of plaintiff's lawyers on October 29, 1998, the same date on which Mr. Heinzel was to appear for deposition as a document custodian.

### C. The History of the Packard Bell Computer at Issue.

One of the computers covered by the request for inspection was a Packard Bell personal computer purchased by Mr. Heinzel in 1994 (Def.Mem.Ex. E, Heinzel Aff. ¶ 2). The computer was serviced twice in 1995: the first time because it was functioning improperly, and the second time to add memory and a faster modem (*Id.* ¶ 3). There is no evidence that the Packard Bell computer was serviced again at any time between 1995 and the time it was brought to the offices of plaintiff's counsel for inspection on October 29, 1998.

According to Mr. Heinzel, he kept the Packard Bell computer in a basement office in his home (Pl.Mem.Ex. F, Heinzel Dep. 10). Mr. Heinzel said that beginning sometime in 1997, the Packard Bell com-

---

**2.** In this regard, it is significant that the Seventh Circuit has recognized that the advisory committee comments to Rule 34 "made clear that computer data is included in Rule 34's description of documents." *Crown Life Insurance Co. v. Craig,* 995 F.2d 1376, 1383 (7th Cir.1993).

puter began to work sporadically, after it was struck by an air compressor that fell from a shelf and dented the right rear of the computer. According to Mr. Heinzel, at times thereafter the Packard Bell computer would get "hung up" at the Windows for Work Group screen, and he would have to slap it several times or turn the computer off and restart it in order for the computer to function (Pl.Mem.Ex. F, Heinzel Aff. ¶¶ 5–6). Mr. Heinzel said that in addition to being hit by this air compressor in 1997, the Packard Bell computer—which is a desktop sized personal computer—had "fallen off my desktop on at least four to five occasions" prior to October 29, 1998 (*Id.* ¶ 7). Nonetheless, Mr. Heinzel continued to use the Packard Bell computer for business purposes well into October 1998 (Pl.Mem.Ex. G, Heinzel Dep. 189–90).

The Court does not find Mr. Heinzel's testimony about the alleged damage to Packard Bell computer, and its allegedly sporadic performance prior to October 29, 1998, to be entirely credible. Perhaps an air compressor fell on the computer in 1997. However, the Court finds it implausible that a desktop computer would simply "fall off" a desk even once—let alone four to five times—in less than two years. Mr. Heinzel offers no details that would explain how such a bizarre event could have repeatedly occurred. Moreover, the Court finds it implausible that Mr. Heinzel would continue to use the Packard Bell computer for business records into late 1998, as he admits he did, if the computer functioned as sporadically as he claims beginning in 1997. Defendants offer no explanation as to why they did not use one of the other computers to which they had access (Pl.Mem.Ex. F, Heinzel Dep. 12–13), or did not buy a replacement computer.

**D. The Events Between October 23 and October 28, 1998.**

Defendants' memorandum and supporting materials shed no light on what, if anything, defense counsel did to inform the defendants of the Court's October 23, 1998 Order that they "preserve the integrity of all computers that are issue here." [3] However, there is no dispute that between the time of the October 23 Order and the time of production of the computer for inspection on October 29, Mr. Heinzel used the Packard Bell computer on several occasions (Pl.Mem.Ex. E–5). A printout from the directory of the hard drive of the Packard Bell computer reveals that various files were accessed on October 25 and October 26 (Ex. E–5 at 1, 24, 36, 66). Among the files accessed were several "invoice" files on October 25 (Ex. E–5, at 36) and October 26 (Ex. E–5 at 66).

Defendants have offered no explanation as to why Mr. Heinzel accessed invoice files on the Packard Bell computer on October 25 and October 26, after it had been represented to the Court on October 23 that all documents responsive to plaintiff's request (which would include all invoices) had already been produced. To the contrary, in one of his deposition sessions, Mr. Heinzel was asked what he had been doing on the computer a few days before it had been produced for inspection, and he failed to disclose he had accessed those files. Rather, Mr. Heinzel testified evasively, stating only that he had accessed "America Online, maybe, or something like that, or, you know, something" (Pl.Reply Mem.Ex. G, 2/18/99 Tr. 191).

**E. The Events of October 29, 1999.**

On October 29, 1999, Mr. Heinzel appeared at the offices of plaintiff's lawyers for his deposition. At that time, he also

**3.** At the April 14, 1999 status hearing, defendants' counsel—who is not the same counsel who represented defendants in October 1998—said that Mr. Heinzel claims that predecessor counsel did not tell him about the October 23, 1998 Order. The Court finds it is not credible that Mr. Heinzel was informed that he had to produce the computer for inspection, as was clearly the case, but not that he had to maintain the integrity of the computer for that inspection.

brought for inspection the Packard Bell computer as well as two other computers in his possession.

According to Mr. Heinzel's affidavit, which was signed on March 23, 1999 (some five months after the events in question and after he had already been deposed twice), Mr. Heinzel stated that on the morning of the inspection he turned on the Packard Bell computer at his house and it "froze" at the Windows for Work Groups screen (Def.Mem.Ex. E, Heinzel Aff., ¶ 8). Once that happened, according to Mr. Heinzel, he merely turned off the computer and proceeded to transport it to plaintiff's lawyer's offices (*Id.*). Mr. Pavliny attested that he saw the screen frozen at this spot (Def.Mem., Ex. F, Pavliny Aff. ¶ 5). The Court credits this testimony. However, Mr. Pavliny offers no testimony as to what Mr. Heinzel did with the computer between that time and the time it was removed from Mr. Heinzel's house to take to the inspection; nor is any explanation offered for why Mr. Heinzel turned on the computer that morning shortly before the inspection.

Mr. Heinzel further swore that when he arrived at the offices of plaintiff's lawyer's he dropped the computer to the ground (Def.Mem.Ex. E, Heinzel Aff. ¶ 12). Mr. Heinzel's affidavit did not describe what damage, if any, the Packard Bell computer experienced as a result of this episode, and there is no other witness to this alleged dropping of the computer (Mr. Pavliny does not say he saw this occur). Moreover, the Court has been presented with no evidence that Mr. Heinzel disclosed that the computer had been dropped either during his deposition session later in the day on October 29, 1998 or in his subsequent deposition session on February 18, 1999. Indeed, defendants' expert, Mr. Goldberg, stated that in his discussions with Mr. Heinzel, Mr. Heinzel had been at best equivocal about whether the Packard Bell computer had been dropped on the morning of October 29, 1998: "I believe he said he thought he had dropped it that day, also. I think his words were he 'may have dropped it.' He didn't quite recall clearly" (Def.Mem.Ex. D, Goldberg Dep. at 92, *see also id.* 141). Based on this evidence, and the care that the Court would expect any person to exercise when bringing a computer to a Court-ordered inspection, the Court finds that it is not credible that Mr. Heinzel dropped the computer on the morning of October 29.

Upon his arrival at plaintiff's law firm, Mr. Heinzel was deposed as a custodian of records, as directed by the Court on October 23. Despite defense counsel having represented to the Court on October 23 that all documents had been produced, at the deposition on October 29 Mr. Heinzel produced more than 300 pages of additional documents, constituting invoices covering the period from January 1997 through September 1998 (Pl.Mem., Ex. F, Heinzel Dep. 6–8; Pl.Reply Mem. 11). Mr. Heinzel said that any invoices for October 1998 would be on the hard drive of the Packard Bell computer (Pl.Mem., Ex. F, Heinzel Dep. 8–9, 13). In addition, Mr. Heinzel said that there were no other responsive documents on the Packard Bell computer "that were not produced in hard copy form" (*Id.* at 14).

In addition to conducting a deposition of Mr. Heinzel on October 29, plaintiff also attempted to inspect the contents of the Packard Bell computer. However, the Packard Bell computer was not operational (Pl.Mem., Ex. 5, May Dec. ¶ 6). The monitor was turned on, but the screen was blank (Def.Mem.Ex. A, May Dep., 20). Mr. Heinzel represented that the computer had "simply stopped working sometime shortly before the inspection" (Pl.Mem.Ex. E, May Aff., ¶ 6). However, there is no indication that Mr. Heinzel at that time revealed that he had attempted to turn on the computer earlier that morning, or that he allegedly had dropped the computer while carrying it to the offices of plaintiff's lawyer.

**F. The Expert Analysis of the Condition of Packard Bell Computer.**

Plaintiff's expert, Ms. May, and defendants' expert Mr. Goldberg, agree on many of the objective facts concerning the condition of the Packard Bell computer. Their principal disagreement lies in whether to infer from the physical condition an intent to compromise the integrity of the computer or its contents: Ms. May says yes, and Mr. Goldberg says no. Although the Court agrees with Mr. Goldberg that certain aspects of the computer's physical condition may be innocently explained, the Court concludes that certain aspects of the physical condition of the computer indicate an intent to tamper with it—particularly when considered in the overall context of the defendants' conduct in connection with discovery. There are a number of factors central to the Court's finding.

*First*, the parties agree that the Packard Bell computer was operational as of October 25 and October 26, but was not operational on October 29 at the time of the inspection (Pl.Mem.Ex. E, May Dec. ¶¶ 6, 11; Def.Mem.Ex. D. Goldberg Dep. 50–52). Mr. Goldberg later was able to access the information on the hard drive of the Packard Bell computer only by using extraordinary means: he made a copy of the hard drive, attached that copy of a hard drive to another computer, and ran a utility program to correct errors that had "corrupted" certain of the files on the hard drive—including certain invoice files that were responsive to plaintiff's requests (Def.Mem.Ex. D, Goldberg Dep. 22–23).

*Second*, there is no dispute that the cable that connected the hard drive to the mother board of the Packard Bell computer, as well as the cable connecting the floppy drive to the mother board, were both completely disconnected (Pl.Mem.Ex. 5, May Dec. ¶¶ 8(a), 8(d); Def.Mem.Ex. C Goldberg Rpt., 2–4). The connections are through interconnecting 40–pin (for the hard drive) and 34–pin (for the floppy drive) sockets which are designed to fit together snugly. The pins all must be in contact in order for each drive of the computer to function. According to Ms. May, it would be "almost impossible" to remove these cables completely through accidental jostling. Although Mr. Goldberg suggests that it is not difficult to undo the connections, the Court has been provided with a sample of the cable connection and finds that if the connections are properly made, the cables would not be easily dislodged completely from the mother board.

Mr. Goldberg suggests that the cables nonetheless could have been dislodged by the computer being dropped if the cables had not been not tightly connected when the computer was serviced by Best Buy in 1995, but in his deposition admitted that he was simply stating a "possibility" and has no knowledge as to whether the cables were firmly connected by Best Buy (Def.Mem.Ex. D., Goldberg Dep. 79). Moreover, the Court finds that it is unlikely that *both* the cable to the floppy disk *and* the cable to the hard drive would have been improperly secured by the people at Best Buy (indeed, there is no evidence they were both disconnected in the 1995 servicing work). And, the Court further finds that even if the cables had been improperly connected, it is highly unlikely that neither cable would have been dislodged if the computer had been dropped four to five times prior to October 29, as Mr. Heinzel has sworn was the case. Mr. Goldberg also opined that the cable could become completely dislodged if it were caught in the computer cover, but admitted that if that happened he would expect the cable to be creased. However, he did not check the cable and could not say that it was creased (Def.Mem.Ex. D, Goldberg Dep. 114, 141–42, 149–50).[4]

---

4. Defendants imply that this disconnection of the cables might have occurred after the October 29 inspection, when the computer was in the custody of plaintiff's counsel (Defs.' Reply Mem. 3). However, defendants do not assert that the behavior of the computer on October 29 was inconsistent with the cables being disconnected at that time. Indeed, Mr.

*Third,* the Court notes that defendants' expert admits that approximately 80–100 files on the hard drive of the Packard Bell computer were "corrupt[ed]" (Def.Mem.Ex. C, Goldberg Rpt. at 5, subsection j)—and that some of those files contained invoices (Def.Mem.Ex. D, Goldberg Dep. 22–31). Mr. Goldberg opined that this kind of "corruption" of files normally would occur from a power failure while operating the computer or from improperly shutting down the computer (Def.Mem., Ex. C, Goldberg Rpt. at 5–6, subsection j). Mr. Heinzel admits operating the computer on October 25 and 26, and the record shows that he accessed the invoice files at that time. Thus, even Mr. Goldberg's opinion about the possible way in which the computer files were corrupted is consistent with defendants failing to exercise due care to preserve the integrity of the computer files—or worse (a fact that is not altered by Mr. Goldberg's ability later to repair the corrupted files).

*Fourth,* the inside of the computer was free of dust, which indicated that the back had recently been opened and the inside of the computer physically accessed (Pl.Mem. Ex. E, May Dec. ¶ 9). Mr. Heinzel has sworn that he did not remove the computer cover (Def.Mem., Ex. E, Heinzel Aff. ¶¶ 14–15), but the only other explanation offered by defendants for the dust free condition of the entire of the computer is that it was cleaned when last worked on by Best Buy in 1995 (Def.Mem., Goldberg Rpt., Ex. C, at 5, subsection f). However, the last servicing by Best Buy preceded the October 1998 inspection by three years, and Mr. Goldberg admitted that he would usually expect to see dust collect inside a computer within a year after servicing (Def.Mem.Ex. D, Goldberg Dep. at 118).[5]

## G. Recovery of Information from the Hard Drive.

Mr. Goldberg said that when he first examined the Packard Bell computer on February 28, 1999, he had turned the computer and believed that it had short-circuited because of a popping sound and smell of smoke that he observed (Def.Mem.Ex. D, Goldberg Dep. at 18). Significantly, Mr. Heinzel did not indicate that he heard a popping sound or smelled smoke when he allegedly turned on the computer on the morning of October 29. Similarly, there is no evidence that the Packard Bell computer exhibited those characteristics when it was turned on at the offices of plaintiff's lawyers on October 29 at the time of the inspection.

When Mr. Goldberg was deposed on March 16, 1999, nearly five months after the inspection, defendants for the first time produced more than 800 pages of invoices that had been stored on the hard drive of the Packard Bell computer (Def.Mem.Ex. D, Goldberg Dep., 48, 123). Mr. Goldberg was able to access the information from the Packard Bell hard drive only by making a copy of the hard drive from the Packard Bell computer, attaching

Goldberg's hypotheticals are designed to explain how that disconnection could have occurred accidentally while the computer was in defendants' hands. Defendants have offered no evidence to contradict the conclusion that the cables were disconnected as of the October 29 inspection.

5. The Court finds that other aspects of the physical condition of the computer—while somewhat suspicious—are insufficient to independently require the conclusion that defendants attempted to tamper with the computer. For example, the fact that one of the two modems was disconnected from the power supply is consistent with the computer having been upgraded in 1995 to have a faster modem. The fact that the metal plate on the back is bent and the mother board was skewed, and the base slots were bent away from the metal plate, might be consistent with accidental damage from being hit by the compressor. With respect to the fact that the parallel port was disconnected from the metal plate with screws missing, neither Mr. Goldberg nor Ms. May was willing to say that this required an inference of tampering (Def.Mem.Ex. A, May Dep. 121; Goldberg Dep., Ex. D. 119–20)—and thus neither is the Court.

it to a different computer, and running a different version of the DOS operating system than was originally on the Packard Bell computer (*Id.*, at 106–07, 127). The invoices contained on the hard drive that were accessed by Mr. Goldberg span a period of five years, going back to 1994 (*id.* at 48), many of which had not been previously produced. This was contrary to the sworn testimony of Mr. Heinzel, who on October 29 testified that (a) the only invoices on the Packard Bell system other than the ones produced that morning for the period January 1997 through September 1998 were invoices from October 1998, and (b) other than October 1998 invoices, there were no other documents on the Packard Bell computer that had not already been produced in hard copy (Pl. Mem.Ex. F, Heinzel Dep. 8–9, 14).

Although Mr. Heinzel had accessed the invoices files on the Packard Bell computer as recently as October 25 and 26, he did not disclose the existence of those additional documents either in his October 29, 1998 or February 18, 1999 deposition sessions. Those additional documents were disclosed and produced only in the face of plaintiff's motion for sanctions. Defendants have not offered any reason for their failure to produce these documents earlier.[6]

## II.

Informed by this factual background, the Court now turns to the parties' dueling motions for sanctions. The Court will address in turn (a) plaintiff's motion for sanctions under Fed.R.Civ.P. 37; (b) defendants' motion for sanctions under Fed. R.Civ.P. 56(g) and (apparently) 11;[7] and

(c) plaintiff's motion for a finding of contempt.

### A. Plaintiff's Request for Sanctions.

██ The sequence of events described above leaves the Court with no doubt that sanctions against defendants are wholly appropriate. The saga concerning the Packard Bell computer is only one episode in a pervasive course of conduct by defendants that can only be described as calculated to frustrate legitimate discovery. Although the parties' briefing has understandably focused principally on issues concerning the Packard Bell computer that was a subject of the Court's October 23, 1998 preservation order, the Court emphasizes that the only reason that there was ever an order entered concerning the Packard Bell computer, and a dispute arose about what happened to the computer thereafter, is because of the defendants' failure to produce invoices that were clearly responsive to plaintiff's document requests.

In their initial discovery response, defendants produced only a single invoice. Only when plaintiff continued to press did the defendants—grudgingly, and over a five-month period—finally produce the invoices they should have supplied in the first place:

- In response to plaintiff's motion to compel on October 23, 1998, defendants produced a literal handful of additional invoices and represented to the Court that they then had "complied fully" with the request (Pl.Mem. Ex. C, 10/23/98 Tr. 2). Defendants made this representation even though, at the time, there were more than

---

6. Defendants do not address this issue at all in their papers. In addition, at the status hearing on April 14, 1999, in response to a direct question by the Court, defense counsel suggested that perhaps defendants did not understand that they were required to produce documents that were not in hard copy form but that were stored in the computer. Suffice it to say that the Court finds that "explanation" totally unconvincing.

7. The Court says "apparently" because plaintiff's cross motion does not specifically identify Rule 11 as a basis upon which they seek sanctions. However, since the only case law defendants cite in support of their request for sanctions deals with Rule 11, the Court deems it safe to assume that is a basis for the motion, albeit an unstated one.

1,000 pages of unproduced invoices that were available on the hard drive the Packard Bell computer. Plainly Mr. Heinzel did not simply "forget" that there were invoices on the hard drive, as he had been inputting those invoices into the hard drive as recently as September and October 1998.

- On October 29, 1998, when Mr. Heinzel appeared for the Court-ordered deposition as custodian of records, he suddenly was able to produce 332 pages of additional invoices from January 1997 through September 1998 (Pl. Mem.Ex. F, Heinzel Dep. 6–8), despite his counsel representing on October 23 that all the documents had been produced. At that deposition, Mr. Heinzel then testified on oath that the only additional invoices were from October 1998, and that there were no other documents on the hard drive of the Packard Bell computer that had not already been produced in hard copy (*Id.* at 14).

- However, that sworn testimony by Mr. Heinzel also was false. Nearly five months later, in March 1999, defendants produced an additional 800 pages of invoices obtained from the hard drive of the Packard Bell computer, many of which predated January 1997 and which had not previously been produced in any form. Again, it is implausible that Mr. Heinzel could have simply "forgotten" about these pre–1997 invoices when he testified on October 29 that nothing of that kind was on the Packard Bell computer, when just a few days prior to that deposition he had accessed the invoices files on the Packard Bell computer.

- This additional group of 800 plus invoices was not produced by defendants until late March 1999, even though the Packard Bell computer had been returned to the defendants in late January or early February and defendants' expert had accessed the hard drive

and the documents on it several weeks earlier.

This course of conduct, without more, constitutes a clear violation of Rule 37. By requiring plaintiff to file motions to compel in order to obtain documents that should have been voluntarily produced, plaintiff has engaged in conduct sanctionable under Rule 37(a)(4)(A). That provision "allows the party who brought a motion to compel to recover the 'reasonable' expenses incurred in making the motion, including attorney's fees if the Court grants the motion or if the disclosure is provided after the motion was filed." *Second Chance Body Armor, Inc. v. American Body Armor, Inc.*, 177 F.R.D. 633, 636 (N.D.Ill.1998), *citing Rickels v. City of South Bend*, 33 F.3d 785, 786 (7th Cir. 1994) ("Rule 37(a)(4)(A) presumptively requires every loser to make good the victor's costs"). *Second Chance Body Armor* makes it clear that a party may not avoid sanctions merely by producing the documents after a motion has been filed. To allow a party to avoid sanctions by such a contrivance would defeat the purpose of the rules, which is to promote voluntary discovery without the need for motion practice. Thus, "[u]ltimate production of the material in question does not absolve a party where it has failed to produce the material in a timely fashion." *Fautek v. Montgomery Ward & Co.*, 96 F.R.D. 141, 145 (N.D.Ill.1982).

In addition to this generally dilatory conduct in complying with discovery requests, defendants have violated a specific court order, thereby rendering sanctions appropriate under Rule 37(b)(2). The Court's October 23 order could not have been more clear: defendants were ordered "to preserve the integrity of all computers that are at issue here without any spoilation of any information contained therein" (Pl.Mem.Ex. C, 10/23/98 Tr. 4). Elaborating on that already-specific directive, the Court gave examples: "Don't pull the plug at the wrong time"; "Don't take a sledge hammer to it"; "I don't want it spoiled in

any way, okay?" (*Id.* at 5). Under any version of events, defendants failed to comply with that order.

The undisputed evidence shows that the Packard Bell computer functioned on October 25 and 26, at which time Mr. Heinzel accessed the files on the hard drive that contained the invoices. Even assuming the truth of the shifting and often hypothetical explanations offered by defendants for the failure of the Packard Bell computer to function when it was delivered to plaintiff's counsel on October 29, it is defendants who are responsible for that failure:

- According to Mr. Goldberg, it is a normal occurrence for files to become corrupted if there is a power failure when a computer is operating, or if a computer is improperly shut down (Def.Mem., Ex. C, Goldberg Rpt. at 6). The Court specifically admonished defendants not to "pull the plug at the wrong time"—which means, of course, to avoid operating the computer in a manner that could degrade its ability to function. If something happened while Mr. Heinzel was operating the computer that caused it not to operate properly on October 29, that would plainly be attributable to defendants.

- Mr. Goldberg opines that the internal cables could have been dislodged by the computer having been dropped, and Mr. Heinzel belatedly has sworn that he dropped the computer on the way to the inspection on October 29 (although in fact he was much more equivocal in what he told Mr. Goldberg about that subject). But even if that were so, again the cause of the failure of the computer to perform would rest with defendants.

Assuming that the problems with the computer on October 29 were the result of accidental conduct by defendants, that would not be enough to stave off sanctions. The obligation to comply with the Court's order was a strict one, and "[m]ere inadvertence or negligence does not remove [a]

case" from sanctions under Rule 37. *EEOC v. Sears Roebuck & Co.*, 114 F.R.D. 615, 626 (N.D.Ill.1987). Defendants were ordered to "preserve the integrity" of the computers. They brought to the production a Packard Bell computer that had functioned even a few days after the preservation order, but failed to function at the time of the inspection, after Mr. Heinzel had operated it. That, without more, violated the Court's order.

But here, there has been more than "mere inadvertence or negligence." Having reviewed the evidence carefully, the Court is left with the firm conviction that there was a purposeful effort to prevent plaintiff from obtaining the information from the Packard Bell computer. This is not a conclusion that the Court reaches lightly, but one that the Court feels is compelled by clear and convincing evidence. For example:

- Defendants' course of conduct demonstrates that they wished to avoid producing the invoices. Had defendants wished to make full disclosure, even after the Court's October 23, 1998 Order, defendants could have printed all of the invoices from the hard drive of the Packard Bell computer when Mr. Heinzel accessed them on October 25 and 26. Not only did defendants fail to do so, but in two deposition sessions Mr. Heinzel provided misinformation about what invoices in fact were on the hard drive.

- The fact that both cables were completely dislodged from the hard drive and the disk drive, is simply not consistent with accidental conduct. Mr. Goldberg testified that if the internal cables had not been securely seated in the drives that an accidental dropping could dislodge them. But it asks too much to accept that (a) both of the internal cables were improperly connected in 1995, that (b) those internal cables did not become completely disconnected at any time when, according to Mr. Heinzel's testimony, the com-

puter was hit by a compressor and knocked off his desk four to five times in the intervening three years, but (c) only became completely dislodged when Mr. Heinzel supposedly dropped the computer on his way to the offices of plaintiff's lawyer on October 29. Indeed, it asks too much to credit Mr. Heinzel's affidavit statement that he was so careless as to drop a computer he was bringing to Court-ordered inspection: particularly when Mr. Heinzel did not disclose that "accident" in his deposition testimony or in his conversations on the morning of the inspection, did not unequivocally disclose it to his own expert, and no one else witnessed that alleged occurrence.

- Likewise, the absence of dust inside the computer further supports the finding that defendant tampered with the computer. Mr. Goldberg testified that he would normally expect dust within the computer within the space of a year; but this computer had not been serviced for some three years.

In short, the disconnection of the cables and the relatively dust free state of the interior of the computer are best explained as attempts to frustrate the ability to obtain information from the computer. This conclusion is further supported by defendants' overall stonewalling of information that existed on the hard drive of the computer, and Mr. Heinzel's shifting and evasive testimony on key points.

Thus, the Court finds plaintiff has established a clear basis for sanctions under Rule 37(a)(4)(A) and 37(b)(2). Under those provisions, sanctions are appropriate for violations of discovery and court orders unless the Court finds that the conduct of defendants "was substantially justified or that other circumstances make an award of expenses unjust." The foregoing discussion should make it abundantly clear that defendants have failed to establish either of those potential bases for avoiding sanctions. Although the Court has said it already, it bears repeating yet again: none

of the events discussed above—the original motion to compel, the Court's October 23, 1998 Order, and the subsequent events concerning the Packard Bell computer—would have ever arisen had defendants simply produced documents in response to legitimate discovery requests to which they posed no objection, as they were required to do under basic discovery rules. Under these circumstances, the Court finds it not only warranted, but necessary, to award plaintiff its reasonable fees and costs. *Cf., DLC Management Corp. v. Town of Hyde Park,* 163 F.3d 124, 135 (2d Cir.1998) (sanctions are "a rational judicial effort to speak to the entire problem of Defendants' discovery and neglect").

In so ruling, the Court is mindful that "[a]n award of sanctions must be proportionate to the circumstances surrounding the failure to comply with discovery." *Crown Life Insurance Co. v. Craig,* 995 F.2d 1376, 1382 (7th Cir.1993); *Second Chance Body Armor, Inc.,* 177 F.R.D. at 637. The Court thus emphasizes that the only fees and costs that will be reimbursed are those (a) that plaintiff demonstrably incurred, (b) that are "reasonable," and (c) that are in fact the product of defendants' failure to produce the requested documents, and the motion practice and discovery that ensued in connection with that specific failure. Plaintiff should be reimbursed for reasonable attorneys' fees and costs incurred in discovery from non-parties that plaintiff pursued as a result of defendants claiming in October 1998 that they did not possess the invoices they later produced in March 1999, as those costs could have been avoided had defendant produced the invoices in the first place. The reasonable fees and costs of plaintiff's computer expert for the October 29 inspection, for the subsequent inspection in November 1998, for her deposition preparation time, and for her time associated with her work on the motion also should be reimbursed: again, inspection of the computer never would have been necessary had defendants produced the invoices in

response to the legitimate discovery request. Finally, plaintiff should be reimbursed for its reasonable attorney's fees and costs associated with the original motion to compel and with this motion for sanctions (including the time devoted to the depositions of the various witnesses).

## B. Defendants' Counter–Motion for Sanctions.

Defendants seek sanctions on the ground that plaintiff's motion allegedly is "full of baseless statements, half-truths and deceptions designed to mislead the Court into believing that the defendants had intentionally destroyed important documents" (Def.Mem. 2). In particular, defendants assert that plaintiff should be sanctioned because its expert, Ms. May, opined that files or programs had been deleted (when in her deposition she admitted that she had not run tests that would allow her to determine whether this had happened), and that a disconnected modem was operational on October 26 (when in her deposition she later said that she could not attest for certain which of the two modems was operational that day).

■ As a threshold matter, the Court finds that neither of the rules under which defendants seek sanctions—Rule 11 and Rule 56(g)—is applicable here. Rule 11(d) specifically provides that Rule 11 sanctions "do not apply to disclosures and discovery requests, responses, objections, and demotions that are subject to the provisions of Rule 26 through 37." The motion for which defendants seek sanctions, is a motion pursuant to Rule 37, which is not governed by Rule 11. Likewise, Rule 56(g) by its terms specifically pertains to affidavits submitted in connection with summary judgment motions, not with discovery motions under Rule 37. Thus, defendants have chosen inapt vehicles for their sanctions request.

Even were Rule 11 potentially applicable, defendants have failed to follow the procedural steps required to initiate a motion for sanctions under Rule 11. Rule 11(c)(1)(A) states that "[a] motion for sanctions under this Rule shall be made separately from other motions or requests..." Here, defendants have combined their motion for Rule 11 sanctions with their response to plaintiff's sanctions motion, an approach that is contrary to Rule 11's explicit requirement.

In addition, Rule 11(c)(1)(A) requires that a party seeking sanctions must serve (but not file) the motion on the opposing side, and give the other side 21 days to withdraw or correct the contention that allegedly violates Rule 11. This "safe harbor" provision, enacted as part of the 1993 amendments to Rule 11, was intended to protect a party from a motion for sanctions if that party timely withdraws or corrects the offending allegation. The advisory committee notes state that "[t]o stress the seriousness of a motion for sanctions and to define precisely the conduct claimed to violate the Rule, the revision provides that the 'safe harbor' period begins to run only upon service of the motion." 1993 Advisory Committee Notes to Rule 11(c). In this case, defendants failed to provide this 21–day safe harbor period to plaintiff and, for this reason as well, the request for Rule 11 sanctions is defective.

Finally, the Court notes that even were Rule 11 or Rule 56(g) applicable, the Court does not find that plaintiff's have engaged in conduct that would violate either provision. The Seventh Circuit has recognized that the "Rule 11 sanctions serves an important purpose and is a tool that must be used with utmost care and caution." *Stotler & Co. v. Able,* 870 F.2d 1158, 1167 (7th Cir.1989) (affirming denial of a motion for sanctions under Rule 11). "Rule 11 does not allow an award of sanctions just because things went poorly after investigation that was adequate in light of what was known (and how much time was available) before the paper was filed." *Rose v. Franchetti,* 979 F.2d 81, 87 (7th Cir.1992), *quoting Mars Steel Corp. v. Continental Bank N.A.,* 880 F.2d 928, 932 (7th Cir. 1989) (*en banc*).

With respect to the defendants' claim that plaintiff's expert opined that files or programs had been deleted, Ms. May never squarely asserted in her declaration or her deposition that documents had been deleted. She opined that programs and files "were deleted *or ceased to be functional*" (Pl.Mem.Ex. E, May Dec. ¶ 6) or were "*otherwise corrupted*" (*Id.* ¶ 11). In fact, Ms. May's assertion that files had "ceased to be functional" or were "otherwise corrupted" is correct, as defendants' expert Mr. Goldberg acknowledged: he admitted that the Packard Bell computer was not operational on October 29, even though it operated on October 25 (Def.Mem.Ex. D, Goldberg Dep. 50–52), and he further admitted that 80 to 100 files—including certain invoice files—were "corrupt" (*Id.* Ex. C, Goldberg Rpt. at 5). When defendants revealed that they were able to access all of the documents that apparently were on the hard drive of the Packard Bell computer, plaintiff acted responsibly and withdrew its request for the sanction of a default judgment based on spoliation of evidence.

As to the question of the modem, Ms. May's declaration does not clearly say which modem she believed was operational in the few days prior to the October 29 inspection. However, *neither* modem was functioning on October 29, and Ms. May stated that one modem that was disconnected in a way that "could not have happened accidentally" (Pl.Mem.Ex. E, May Dec. ¶ 8e). Defendants do not dispute that this modem was intentionally disconnected, but have offered an innocent explanation (that the Court has accepted)—that it was disconnected when an upgraded modem was installed.

None of this—or the other criticisms defendants' offer of plaintiff's expert declaration—amounts to conduct by plaintiff that is sanctionable. The Court strongly believes that a motion for sanctions should not simply be a reflexive response to a motion for sanctions by one's adversary. The basic premise of the declaration offered by plaintiff's expert is that the failure of the Packard Bell computer to operate properly on October 29, 1999 is attributable to conduct by Mr. Heinzel between October 23 and 29. The Court agrees with that premise. The fact that the Court does not agree with every assertion offered by plaintiffs' expert in support of that premise does not make her declaration sanctionable—just as the Court does not find sanctions independently appropriate against defendants merely because the Court disagrees with certain assertions by their expert.[8]

## C. Plaintiff's Motion for Contempt.

 Finally, the Court turns to plaintiff's request for a finding of contempt as a result of defendants' violation of the October 23, 1998 Order. In order to establish contempt, the moving party must show an " 'unequivocable command' which the party in contempt violated." *Stotler & Co.*, 870 F.2d at 1163. The moving party need not establish willfulness, but may premise a finding of contempt on a failure of a party to be "reasonably diligent and energetic in attempting to accomplish what was ordered." *Id.* The burden of a party seeking contempt is proof by clear and convincing evidence; the determination of whether that standard has been met is within the discretion of the district court, and will not be reversed unless the finding constitutes an abuse of discretion or is clearly erroneous. *Id.*

 In this case, given the Court's finding that the sanctions sought by plaintiff are appropriate under Rule 37, the Court

---

8. Defendants also claim that plaintiff's expert declaration offers only "unsupported speculation" and thus, even if their request for sanctions is denied, the declaration should be totally disregarded. The Court disagrees. The Court has independently reviewed the declarations, reports and testimony of both experts, and the fact findings set forth above reflect the Court's determination as to the weight and credibility to be given to the various opinions and observations they offer.

finds it unnecessary to address whether defendants' conduct also was contemptuous. But were it necessary to reach the issue, the Court believes that the foregoing fact findings more than adequately support a contempt finding: there was a clear order on October 23 ("to preserve the integrity of all computers that are at issue here") and, at a minimum, the defendants were not "reasonably diligent and energetic in attempting to accomplish what was ordered."

## CONCLUSION

For the foregoing reasons, plaintiff's motion for sanctions is granted (doc. # 36), and defendants' cross-motion for sanctions is denied (doc. # 45). As is authorized by Rules 37(a)(4) and Rule 37(b)(2), the Court imposes these sanctions against the defendants directly. The parties are directed to attempt to resolve the issue of reasonable fees and expenses recoverable pursuant to this opinion during the next 21 days. If that issue cannot be informally resolved by the parties, plaintiff shall file by June 4, 1999 an itemized petition for the costs and fees it seeks. Defendants shall respond to any fee petition by June 25, 1999, and must state any objection to specific items in plaintiff's petition with particularity. The matter is set for status on May 20, 1999 at 10:00 a.m.